MAUI LAND AND PINEAPPLE COMPANY, INC., a Hawaii corporation, Plaintiff-Appellee, *v.* DILLINGHAM CORPORATION, a Hawaii corporation, ALA MOANA HAWAII PROPERTIES, a Hawaii limited partnership, BROOKS WALKER, JR., RAY L. WILSON, JR., and DAVID T. PIETSCH, Defendants-Appellants

NO. 9057

(CIVIL NO. 5506)

JANUARY 11, 1984

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

The issue is whether the conveyance of a lease by the Dillingham Corporation (Dillingham or the corporation) to Ala Moana Hawaii Properties (Ala Moana), a limited partnership whose limited partners are the corporation's stockholders, was an "assignment" for purposes of Paragraph 15(a) of the lease agreement between Dillingham and the Maui Land and Pineapple Company, Inc. (Maui Land). The Circuit Court of the Second Circuit held that the transfer, effected as part of a plan to liquidate Dillingham's commercial real estate operating assets in Hawaii, "constitute[d] an assignment" and awarded Maui Land summary judgment in the declaratory action brought against Dillingham and Ala Moana. But we think the court's summary disposition of the question was improper, inasmuch as the crucial language of Paragraph 15(a) can be read to sustain either the position of the plaintiff or the defendants' thesis that the paragraph did not apply to the transaction and there was no evidence of its intended meaning. Thus, we vacate the judgment and remand the case for trial.

I.

The controversy at bar stems from the Plan of Partial Liquidation adopted by Dillingham's stockholders on June 30, 1981 upon recommendation of the corporation's Board of Directors. The plan's purpose was "to terminate . . . [Dillingham's] commercial real estate development, management, and ownership activities in Hawaii and enable . . . [stockholders] to receive substantially all of the net proceeds . . . from the disposition of the assets related to such activities." One of the properties proposed for liquidation was the

Kaahumanu Shopping Center at Kahului, Maui, which the corporation had constructed on land owned by Maui Land pursuant to a "Lease"[1] executed on August 31, 1971.

The partial liquidation plan outlined by the Board of Directors involved the initial transfer by the corporation of the properties designated for liquidation to Ala Moana, a limited partnership expressly created to facilitate the process, and the distribution to stockholders of depository receipts evidencing ownership of partnership units equal to the number of shares of common stock they owned. The plan contemplated a subsequent disposition of the properties by Ala Moana and an eventual prorata distribution of the net proceeds among Dillingham's stockholders.

Although it conveyed the "Lease" and all of its "estate right, title, and interest in the demised premises, and in all improvements thereon, and in all subleases of portions of the property" to Ala Moana by a document entitled "Assignment of Lease," Dillingham did not seek Maui Land's consent thereto. It did not consider the transaction an assignment of the "leasehold interest or any interest therein . . . to an institutional lender or any other purchaser" for which consent was required under Paragraph 15(a) of the "Lease."[2]

---

[1] Three distinct terms or periods with different conditions and obligations are set forth in the lease. During the "Initial Term" Dillingham agreed, at its own expense, to "engage in and prosecute all relevant investigations and procedures for the purpose of determining" the feasibility of developing a shopping center. The "Secondary Term" commenced with Dillingham's election to proceed with the project, and during this term it was obliged, again at its own expense, to "construct and complete . . . a first class regional shopping center." During the first two periods Dillingham paid rent in a nominal sum. The "Regular Term" of fifty-five years began with the completion of construction and the occupancy of a substantial portion of the premises by tenants and will extend to the year 2028. During this period Dillingham is obligated to pay fixed sums as "ground rent" as well as "percentage rent" based on the gross rent it receives from tenants. The "lease" may be characterized as both a conveyance and a contract.

[2] Paragraph 15(a) provides:

(a) In addition to the right provided in Paragraph 21 and otherwise herein, at any time during any term of this Lease, Lessee shall have the right to assign its leasehold interest or any interest therein under this Lease to an institutional lender or to any other purchaser, with Lessor's consent, which consent shall not be unreasonably withheld. In the event of such assignment with consent, Lessor will execute an appropriate instrument releasing Lessee from further liability under this Lease, provided the assignee shall have undertaken in writing, as a direct commitment to Lessor, to fully perform and abide by the terms, covenants and

But the liquidation plan, which received extensive media coverage, did not escape Maui Land's attention. It promptly apprised Dillingham by letter of the necessity for the lessor's consent to the transfer of the lease from the corporation to the limited partnership and assured Dillingham that the necessary consent would not be withheld. The communication also carried a suggestion that a subsequent assignment of the lease would not be viewed as favorably.[3]

Dillingham responded by reiterating its belief that "a transfer without consideration to a limited partnership formed to assist in the partial liquidation of some of . . . [its] assets" did not "fall within the coverage of either paragraph 15(a) or paragraph 15(b) of the lease." Undaunted by the negative response, the lessor nevertheless recorded its unsolicited and unwanted consent to the transaction in a letter to the lessee.

Maui Land followed through with an action in the circuit court seeking declaratory and injunctive relief. It sought a declaration that the transaction in question "was an assignment of the Kaahumanu Leasehold Estate within the scope of" Paragraph 15(a) and an "injunction that prohibits . . . [Ala Moana] from making any further assignment . . . without first obtaining plaintiff's prior consent, as provided by" Paragraph 15(b).[4]

---

provisions of this Lease, and provided further that Lessee shall guarantee completion of the Improvements, free and clear of all mechanics' and materialmen's liens, in the event Lessee assigns its leasehold interest hereunder prior to the completion of Improvements hereunder.

[3] Maui Land's letter to Dillingham stated in relevant part:

Please note that under paragraph 15(a) of the Lease, the Lessor's consent is required for the transfer of the Lease from Dillingham Corporation to the Limited Partnership, which consent cannot be unreasonably withheld. Please be assured that Maui Land & Pineapple Company, Inc. will consent to the transfer of the Lease from Dillingham to the partnership; but we do call your attention to paragraph 15(b) of the Lease as to any subsequent assignment of the Lease.

[4] Paragraph 15(b) of the "Lease" reads:

(b) If Lessee assigns its leasehold interest or any interest therein pursuant to Subparagraph (a) hereof, subsequent assignments thereof will not be authorized or permitted without the prior consent of Lessor, and Lessor need not be reasonable in withholding consent thereto. Excluded from the restriction imposed by this Subparagraph (b) are assignments by way of mortgage, pursuant to Paragraph 21 hereof.

After the submission of responsive pleadings by the defendants, Ala Moana, alleging the absence of genuine issues as to any material fact, moved for partial summary judgment. It prayed for the entry of a judgment that consent to the transfer of the lease from Dillingham to Ala Moana was unnecessary, arguing that the pertinent lease provision unambiguously declared consent was required only for an assignment to an "institutional lender" or a "purchaser" and Ala Moana fit "neither of these categories." Maui Land countered with a Motion For Preliminary Injunction, seeking to enjoin a reported sale of the leased premises. It averred an agreement for the sale of the shopping center by Ala Moana had been reached but Dillingham had not requested the lessor's "consent to the assignment of the Kaahumanu Shopping Center Lease" to Ala Moana; it claimed irreparable damage would ensue from a sale of the center during the pendency of the action.[5]

Dillingham submitted its motion for summary adjudication after the foregoing plea for temporary injunctive relief. And Maui Land also moved thereafter for summary judgment, claiming entitlement to judgment because Ala Moana "was a 'purchaser' of the Kaahumanu Shopping Center within the customary meaning given that word." Citing the definitions of "purchase" in legal dictionaries[6] in support of the foregoing proposition, Maui Land asserted the court "must assume that the attorneys who drafted the Kaahumanu Shopping Center Lease consulted the standard legal dictionaries and thus used the word 'purchaser' in the customary legal dictionary sense." It further directed the court's attention to the definition of

---

[5] Subsequently, the motion seeking a temporary injunction was withdrawn and the plea for injunctive relief was abandoned.

[6] The cited portions of the definitions read:

*Purchase.* To acquire title otherwise than by descent. To acquire title by the voluntary act of another.
*Ballentine's Law Dictionary* 1027 (3d ed. 1969 Anderson)

and

*Purchase.* Transmission of property from one person to another by voluntary act and agreement, founded on a valuable consideration. In a technical and broader meaning relative to land generally means the acquisition of real estate by any means whatever except by descent.
*Black's Law Dictionary* 1399 (4th ed. 1951).

"purchase" and "purchaser" in the Uniform Commercial Code.[7]

The circuit court after reviewing the memoranda submitted by the parties and hearing oral argument, found that "it was an intent of the parties that . . . [Ala Moana] came [sic] within the definition of 'any other purchaser' " as the term is employed in paragraph 15(a). Summary judgment in favor of Maui Land was entered thereafter, and the appeals of Dillingham and Ala Moana to this court followed.

## II.

Since the appeals are from an award of summary judgment, our analysis centers on whether there was no genuine issue as to any material fact and whether Maui Land was entitled to judgment as a matter of law. Hawaii Rules of Civil Procedure (HRCP) 56(b); *see also Hulsman v. Hemmeter Development Corp.,* 65 Haw. 58, 61, 647 P.2d 713, 716 (1982); *Silver v. George,* 64 Haw. 503, 507, 644 P.2d 955, 958 (1982); *Lau v. Bautista,* 61 Haw. 144, 146-47, 598 P.2d 161, 163 (1979). The parties agree there was no issue of material fact to be determined by the court below. But of course, the purported agreement ends there.

### A.

Dillingham and Ala Moana would have us reverse the circuit court on grounds that there was no "assignment" within the purview of paragraph 15(a) because the "plain and ordinary" meaning of the word "purchaser" is "one who acquires either real or personal property by buying it for a price in money" and Ala Moana "did not 'buy' the Kaahumanu leasehold interest for money." "Obviously," they say, "the parties to the Kaahumanu lease were thinking of the ordinary meaning of the term" when the lease was executed.

Relying on dictionary definitions and the Uniform Commercial

---

[7] HRS § 490:1-201 contains the following definitions:

(32) "Purchase" includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift or any other voluntary transaction creating an interest in property.

(33) "Purchaser" means a person who takes by purchase.

Code as it did below, Maui Land urges an affirmance of the judgment because Ala Moana was "a 'purchaser' of the Kaahumanu Shopping Center within the customary meaning of that word." The "knowledgable attorneys who drafted the Lease, and sophisticated persons who negotiated the Lease terms" could not, it claims, have been "ignorant of the common meaning of the word 'purchase.' "

Thus, the issue in the view of the litigants boils down to whether the appellants' "plain and ordinary" meaning or the appellee's "customary and common" meanings should be applied. Yet we are not directed to proof in the record manifesting that the persons who bargained for and set down the conditions of the lease actually had one or the other in mind when their tasks were done.

### B.

We would be inclined to adopt Maui Land's thesis that Ala Moana's acquisition of the lease by means other than descent rendered it a "purchaser" if we could say the lease in question is primarily a conveyance. But the document before us "is both a conveyance and a contract." C. Moynihan, *Introduction to the Law of Real Property* 69 (1962). Like the typical modern lease, it "is a highly complex instrument in which the contract element is a substantial, if not the predominant ingredient." *Id.* at 70; *cf. Lau v. Bautista,* 61 Haw. at 149, 598 P.2d at 165 (A lease is "essentially a contractual relationship."); *Lemle v. Breeden,* 51 Haw. 426, 433, 462 P.2d 470, 474 (1969) (A lease is, "more importantly, a contractual relationship."). Hence, we think it more appropriate to seek guidance from pertinent precepts of contract law.

When called upon recently to lend meaning to an insurance policy, we noted "[i]nsurance policies are subject to the general rules of contract construction" and said "the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears . . . [therefrom] that a different meaning is intended." *First Insurance Co. v. State,* 66 Haw. 413, 424, 665 P.2d 648, 655 (1983). Though a reading of "purchase" and "purchaser" consistent with their ordinary and accepted meaning in common speech may favor Dillingham and Ala Moana, we cannot see our way clear to rule they are entitled to judgment. For when the

inferences to be drawn from the underlying facts are viewed in the light most favorable to Maui Land, as they must, we cannot say there is no genuine issue as to a material fact and Dillingham and Ala Moana are deserving of judgment as a matter of law, any more than Maui Land is. *See Technicolor, Inc. v. Traeger,* 57 Haw. 113, 118-19, 551 P.2d 163, 168 (1976); *Gum v. Nakamura,* 57 Haw. 39, 42, 549 P.2d 471, 474 (1976); *Abraham v. Onorato Garages,* 50 Haw. 628, 631, 446 P.2d 821, 825 (1968).

A key word in paragraph 15(a), "purchaser," remains open to more than one reading, and we have no alternative but to conclude the word "is ambiguous and its use requires further inquiry to determine the intention of the parties." *Di Tullio v. Hawaiian Insurance & Guaranty Co.,* 1 Haw. App. 149, 155, 616 P.2d 221, 226 (1980). Moreover, "[a]n agreement should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase or clause." *Ching v. Hawaiian Restaurants, Ltd.,* 50 Haw. 563, 565, 445 P.2d 370, 372 (1968).

The award of summary judgment to Maui Land is set aside, and the case is remanded to the circuit court for trial.

*John Jubinsky (Rosemary T. Fazio* with him on the briefs; *Ashford & Wriston,* of counsel) for defendants-appellants Ala Moana Hawaii Properties, et al.

*Maria Sousa* for defendant-appellant Dillingham Corp.

*William F. Crockett (Crockett & Nakamura,* of counsel) for plaintiff-appellee.