WOODALL, Justice.
 

 Kaufman Gilpin McKenzie Thomas Weiss, P.C., an Alabama law firm (“the firm”), sued Alan E. Rothfeder and Jo Karen Parr, seeking, among other things, a judgment declaring certain legal fees to be the property of the firm. Ultimately, the legal fees were interpleaded, and the firm claimed to be entitled to all the inter-pleaded funds. The trial court purported to render a judgment in favor of the firm, but it awarded Rothfeder and Parr portions of the interpleaded funds. We find the trial court’s order internally inconsistent; therefore, we reverse and remand.
 

 Facts and Procedural History
 

 At the time of the events underlying this action, Rothfeder and Parr were attorneys and shareholders in the firm. The bylaws of the firm provide that “[t]he business, affairs and property of [the firm] shall be managed by a Board of Directors ... who shall be elected at the annual meeting of the shareholders.” The bylaws further provide that “[t]he Board of Directors shall have one Executive Committee made up of the following functional areas of firm management: Administration, Legal Operations, Finance and Facilities.” According to the bylaws, the executive committee is “responsible for the management and day-to-day operation of [the firm.]” The executive committee has responsibility for “evaluating] and recommending] guidelines for the compensation of both legal and non-legal personnel” and for “preparing] an annual budget and set[ting] budget policy.” The executive committee also determines “at the end of each fiscal year ... the amount of funds available for distribution to the Shareholders, and ... calculate^] the proposed allocation of funds available for distribution. The proposed distribution of funds shall be submitted to the Board of Directors for approval.”
 

 In February 2003, Rothfeder met with Derek Warren, an accountant practicing in Geneva, Alabama, to discuss the referral of one of Warren’s clients, Ruth K. Baucom, to the firm for assistance with tax and estate-planning matters. On behalf of the firm, Rothfeder agreed to represent Bau-com.
 

 On February 23, 2003, Parr sent Bau-com an engagement letter confirming the firm’s representation. The engagement letter provided, among other things, that Baucom was “represented by [the] entire law firm,” although “Rothfeder, Richardson B. McKenzie III, and [Parr] [would] have primary responsibility for [Baucom’s] representation.” The engagement letter also provided that the firm would represent Baucom on a contingency-fee basis, receiving 33 1/3% of the difference between $5 million and the federal and state estate taxes finally determined to be due from Baucom’s estate. The engagement letter provided that the contingency fee would be payable within 30 days following the earliest of certain events, one of which was the receipt of an estate-tax closing document from the Internal Revenue Service (“IRS”).
 

 Baucom died in March 2003. The firm continued to represent her estate in accordance with the terms of the engagement letter. In January 2007, Baucom’s estate received an estate-tax closing document from the IRS confirming the estate’s total tax liability. Pursuant to the terms of the
 
 *897
 
 engagement letter, the firm was then entitled to a $1.6 million contingency fee (“the Baucom fee”) for its representation of the estate.
 

 Rothfeder and Parr met with Warren to make arrangements for payment of the Baucom fee. During the meeting, Roth-feder arranged with Warren to have the Baucom fee deposited into an interest-bearing account in Warren’s name, where it would remain in escrow until such time as any remaining probate distributions were made and the appropriate orders were issued by the probate court. In a letter written by Parr to Warren to confirm the arrangements with regard to the Baucom fee, Parr stated:
 

 “[I]t is acceptable to [Rothfeder] and me for you to hold the funds, as agent, in such interest bearing accounts as you determine appropriate so long as written instructions are delivered to the financial institutions requiring that funds can be withdrawn only on the receipt of written instructions given jointly by you and [Rothfeder] or me. In addition for handling the receipt and disbursement of the funds and serving as the escrow agent, we agreed that you will be entitled to any interest earned on the depository accounts.”
 

 Rothfeder also agreed to pay Warren an additional $200,000 for his help with the Baucom estate. This fee was to be paid from the $1.6 million Warren held as escrow agent. Rothfeder and Parr argue that “Rothfeder agreed to enhance Warren’s fees because he wanted to foster and build a relationship with Warren, who was perceived by Rothfeder and Parr as having a growing practice representing wealthy landowners in south Alabama.” Rothfeder’s brief, at 22; Parr’s brief, at 21. According to Rothfeder and Parr, this action was consistent with the firm’s general practice.
 

 After their meeting with Warren, Roth-feder met with Richardson McKenzie and George Thomas, two attorneys at the firm, to discuss the Baucom fee. At that time, McKenzie and Thomas constituted the firm’s executive committee. The firm argues:
 

 “On March 1, 2007, Rothfeder met with Thomas and McKenzie and informed them for the first time that the firm had earned a fee from its Baucom representation,
 
 which he represented was only $1.2 million dollars.
 
 Rothfeder did not tell Thomas and McKenzie that the fee was actually $1.6 million or that he and Parr had agreed to give Derek Warren over $200,000 out of the fee, plus all interest earned on the fee. Rothfeder. also informed Thomas and McKenzie that he wanted to resolve how the fee would be split before the money came into the firm, and requested a memorandum explaining to him how the Baucom fee would be split.”
 

 The firm’s brief, at 16 (emphasis in original). Rothfeder testified that he told Thomas and McKenzie that the Baucom fee would be about $1.2 million because he “did not want to ‘overestimate fees net to the firm.’ He said, ‘... I’m conservative and never overestimate my fees, and never have.’ ” Rothfeder’s brief, at 30; Parr’s brief, at 29.
 

 Upon Rothfeder’s request, McKenzie prepared a memorandum outlining the proposed allocation of the Baucom fee. Rothfeder and Parr argue that the proposed allocation “differed greatly from the law firm’s past practices with respect to the allocation of contingency fees.” Roth-feder’s brief, at 31; Parr’s brief, at 29. According to Rothfeder and Parr, prior contingency fees had been allocated based
 
 *898
 
 on the five-percent rule.
 
 [1]
 
 However, the firm argues that in May 2003 the board of directors unanimously adopted a new compensation system, known as the Hilde-brandt plan. Under the Hildebrandt plan, attorneys for the firm
 

 “would each present an annual plan, which included their active files and expected income from same, and other factors the firm should consider in determining the attorney’s compensation for the year. An Executive Committee was appointed by the Board of Directors to review the plan and, at year end, recommend individual attorney compensation to the Board [of Directors]. The Board [of Directors] would then adopt, modify or reject the Executive Committee’s recommendations.”
 

 The firm’s brief, at 12. The firm argues that McKenzie’s memorandum “reiterated that the Hildebrandt plan adopted by the Board of Directors in 2003 expressly addressed how contingency fees are to be handled by the firm, and that the Executive Committee would also, as provided by the Hildebrandt plan, make a recommendation regarding the fee’s allocation.” The firm’s brief, at 16.
 

 Rothfeder and Parr acknowledge that the board of directors adopted the Hilde-brandt plan in 2003, but they argue that the Hildebrandt plan was “adopted only ‘for calendar year 2003.’” Rothfeder’s brief, at 33; Parr’s brief, at 31. Parr testified that
 

 “[i]t was her belief that the five-percent rule would apply to any contingency fee paid by the Baucom estate pursuant to the February 27, 2003 engagement letter executed prior to adoption of the Hildebrandt compensation proposal.
 

 Parr testified that she was not aware of any change in the method of allocation of contingency fees:
 

 “ ‘No I am not. In 2003, when the Hildebrandt Proposal was brought to the firm by the Executive Committee, I remember distinctly a dialogue between Alan Rothfeder and Robert Gil-pin wherein [Rothfeder] asked, “What happens if I hit another big fee[?]” Robert’s response was, “We haven’t worked that out yet. We don’t know how that’s going to be handled.”
 

 “ ‘This was of prime importance to me because in February, before this, I had agreed to accept responsibility for doing all the work in what would be a major case in the Baucom matter. And I anticipated that I was going to have to expend substantial hours if I were to reap the rewards of that case.
 

 “‘So had Mr. Rothfeder not received that response from Robert Gil-pin, I would have inquired further, but I, you know, accepted Robert’s word that, hey, this hasn’t been worked out, and this was going to be dealt with I thought as a separate matter.’ ”
 

 Rothfeder’s brief, at 34-35; Parr’s brief, at 32-33.
 

 Rothfeder and Parr met again with Thomas to try to resolve the dispute over disbursement of the Baucom fee. The firm says that Rothfeder and Parr proposed that the firm receive 15% and the attorneys who worked on the matter receive 85%. The firm rejected the offer.
 

 On May 23, 2007, the firm, acting through its executive committee, sent Rothfeder and Parr a letter, stating, among other things, that it found Rothfed
 
 *899
 
 er and Parr’s arrangement with Warren and their actions with regard to the Bau-com fee questionable. The firm also stated that placing the entire Baucom fee in escrow and outside the firm’s control was unacceptable. The firm then demanded that Rothfeder and Parr execute an “Acknowledgment and Power of Attorney,” giving the firm control of the escrow account containing the Baucom fee. The firm stated that it was “prepared to call a special meeting of the shareholders ... in order to address the firm’s response if you do not sign. There is also a possibility that we should have such a meeting even if you do sign.”
 

 Rothfeder testified that “the statement in the Executive Committee’s letter that he had placed the fee outside the control of the law firm was a ‘total misstatement, and it was an insinuation that [he] took their money.’ ” Rothfeder’s brief, at 37; Parr’s brief, at 35. Rothfeder insisted that “[he] had no control over the money. There was no way that [he] wasn’t going to let that money come in. It belonged to the firm.” Rothfeder’s brief, at 37; Parr’s brief, at 35. Rothfeder and Parr responded to the firm’s May 23, 2007, letter by resigning from the firm.
 

 The firm states that, on May 31, 2007, Thomas e-mailed Rothfeder and Parr, “ask[ing] them to meet with him again to assist the firm in billing their clients so they could all easily and professionally transition for their departure.” The firm’s brief, at 19. The firm says that Rothfeder and Parr did not respond to that request or to subsequent requests for help with billing their clients. Based upon its best available records, the firm eventually billed Rothfeder’s and Parr’s clients for the work performed by Rothfeder and Parr before their departure from the firm.
 

 In August 2007, the firm sued Rothfeder, Parr, and Warren, seeking, among other things, a judgment declaring that the Baucom fee was the firm’s property. Rothfeder and Parr answered the complaint and filed a counterclaim, alleging, among other things, that, by failing to act reasonably and fairly in matters regarding compensation, the firm’s executive committee had breached its fiduciary and contractual duties to Rothfeder and Parr.
 

 In November 2007, the parties reached a settlement with Warren. Warren was allowed to retain $200,000 of the Baucom fee, as well as any interest earned on the escrowed funds. Warren deposited the remaining $1.4 million with the circuit clerk, who deposited the money in an interest-bearing account “to be disbursed pursuant to agreement of the law firm and Rothfeder/Parr or court order.” All claims against Warren were then dismissed with prejudice.
 

 Between July 2008 and the bench trial in October 2009, the trial court allowed Roth-feder and Parr to amend their counterclaim several times and to interplead fees paid by clients for services rendered before they resigned from the firm. Roth-feder and Parr claimed that they were entitled to those interpleaded funds. On October 20, 2009, Rothfeder and Parr moved the trial court to allow them to amend their counterclaim to add claims seeking recovery under a theory of quantum meruit and alleging unjust enrichment.
 

 Also during that time, the firm made several amendments to its complaint, alleging, among other things, that all the interpleaded funds, including the Baucom fee, were the property of the firm. The firm further claimed that, by interpleading those funds into the trial court instead of turning them over to the firm, Rothfeder and Parr had continued to interfere with the firm’s business and its contractual relationships with its clients.
 

 
 *900
 
 On November 23, 2009, following a bench trial, the trial court entered its final judgment, which included the following findings of fact:
 

 “1. The affairs of the law firm are governed by the by-laws, resolutions, plans and actions adopted by. the board of directors of the law firm.
 

 “2. For at least the last ten years, all compensation, salary, bonuses or money of any kind received by attorneys including [Rothfeder and Parr] from the law firm has been approved and authorized by the board of directors. In fact, the evidence shows that this has been the practice since the inception of the [firm] in 1983. For the years 2003 and forward, all compensation, salary, bonuses or money of any kind received by all attorneys including [Rothfeder and Parr] has been recommended by the executive committee of the law firm and then approved by the board of directors of the law firm.
 

 “3. [Rothfeder and Parr] voluntarily left and disassociated themselves from [the firm] and [Rothfeder’s and Parr’s] stock in [the firm] has no marketable value.
 

 “4. [Rothfeder and Parr] are no longer participants in the business of the law firm and therefore have no further participation in the dispensation of the law firm’s assets.”
 

 The trial court then ordered:
 

 “a. The Joint Motion of Defendants Rothfeder and Parr for leave to amend counterclaims, filed on October 20, 2009, is GRANTED.
 

 “b. In regard to the [firm’s] Complaint as Amended, judgment is hereby rendered in favor of the [firm] and against [Rothfeder and Parr].
 

 “c. In regard to the Counterclaims of [Rothfeder and Parr] as Amended, judgment is hereby rendered in favor of the [firm] and against [Rothfeder and Parr] except as set forth in paragraphs d & e below.
 

 “d. The Clerk is directed to pay and disburse from the interpled funds the sum of [$340,000] made payable to the Defendant Alan E. Rothfeder and delivered to his attorney, Marvin H. Campbell.
 

 “e. The Clerk is directed to pay and disburse from the interpled funds the sum of [$50,000] made payable to the Defendant Jo Karen Parr and delivered to her attorney, James Anderson.
 

 “f. The [firm] is entitled to have and recover the remaining balance of the interpled funds being held by the Clerk of the Court and such funds shall be disbursed and made payable by the Clerk to [the firm] and delivered to its attorney Joe Espy, III.
 

 “g. [Rothfeder and Parr] shall have no further right, title or interest in the [firm] and [Rothfeder’s and Parr’s] stock in [the firm] is hereby cancelled and declared to be null and void.
 

 “h. Any remaining claims by the parties not separately disposed of in this Order are hereby denied on the merits.
 

 “i. All parties shall be responsible for their own attorney’s fees in this case.
 

 “j. The parties shall bear their own costs.”
 

 Rothfeder and Parr each moved for a new trial or, in the alternative, to alter and amend the judgment. The trial court denied those motions. Rothfeder and Parr now appeal separately (cases no. 1090639 and no. 1090671), and the firm cross-appeals (cases no. 1090723 and no. 1090724).
 

 Analysis
 

 “[T]rial courts, in the ordinary discharge of their duties, [should] review their judgments to insure that such judgments are internally consistent and, if necessary, supported by sufficient findings to
 
 *901
 
 permit review on appeal.”
 
 Forbes v. Hawaii Culinary Corp.,
 
 85 Haw. 501, 507 n. 5, 946 P.2d 609, 615 n. 5 (Haw.Ct.App.1997). Effective appellate review is not possible where there is “some inconsistency” in the trial court’s judgment, and this Court “cannot definitively conclude from the record what the trial court intended when it entered” its judgment.
 
 McCutcheon v. Slade,
 
 993 So.2d 428, 482 (Ala.2007). The parties raise several issues for this Court to consider. However, effective review of those issues is foreclosed by inconsistencies in the trial court’s judgment.
 

 The judgment is fraught with inconsistency. The trial court first renders judgment in favor of the firm “[i]n regard to the [firm’s] Complaint as Amended.” As previously mentioned in this opinion, the firm, in its amended complaint, claimed that all the funds at issue — including the Baucom fee and the other interpleaded funds — were the property of the firm and, therefore, should be under the firm’s control. However, the trial court, without explanation, then directs the clerk to disburse from the interpleaded funds it had just declared to be the property of the firm $340,000 to Rothfeder and $50,000 to Parr. Those directions are inconsistent with the earlier portion of the trial court’s judgment in favor of the firm with regard to its amended complaint.
 

 The trial court’s findings of fact cast no light upon what the trial court intended when it entered its judgment; instead, they reveal only more apparent inconsistency in the judgment. The trial court found that, “[f]or the years 2003 and forward, all compensation, salary, bonuses or money of any kind received by all attorneys including [Rothfeder and Parr] has been recommended by the executive committee of the law firm and then approved by the board of directors of the law firm.” It is undisputed that, in December 2007, the firm’s board of directors approved the executive committee’s recommendation that Rothfeder and Parr receive no additional compensation for the work they had performed before their resignations from the firm. Nevertheless, the trial court awarded Rothfeder and Parr portions of the interpleaded funds that it had, in effect, previously declared to be the firm’s property and subject to distribution as approved by the firm’s board of directors.
 

 Finally, the amounts the trial court awarded, without explanation, to Rothfeder and Parr reveal nothing concerning the trial court’s intentions when it entered its judgment. Indeed, the parties agree that the amounts awarded have no basis in fact. “The basic problem presented by our inability to determine how the trial court arrived at the figures recited in its order is that we cannot determine with precision the exact evidence upon which that court relied” in directing the clerk to disburse to Rothfeder and Parr amounts from the in-terpleaded funds.
 
 Hensley v. Poole,
 
 910 So.2d 96, 103 (Ala.2005).
 

 For these reasons, we reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.
 

 1090639 — REVERSED AND REMANDED.
 

 1090671 — REVERSED AND REMANDED.
 

 1090723 — REVERSED AND REMANDED.
 

 1090724 — REVERSED AND REMANDED.
 

 STUART, BOLIN, PARKER, and SHAW, JJ., concur.
 

 COBB, C.J., recuses herself.
 

 [1]
 

 . It appears that before 2003 the firm had compensated its attorneys according to a "five-percent rule,” in which 5% of the contingency fee was distributed to the firm and the remaining 95% was divided among the attorneys who had worked on the case and the attorney that originated the case.